337 F.3d 132
 Gary LA BARBERA, Lawrence Kudla, Dennis Gartland, Thomas Gesualdi, Theodore King, Chester Broman, Frank Finkel and Joseph Ferrara, as Trustees and Fiduciaries of the Local 282 Welfare, Pension, Annuity, Job Training and Vacation and Sick Leave Trust Funds, Plaintiffs-Counter-Defendants-Appellants,
v.
J.D. COLLYER EQUIPMENT CORP., and Palmo Leasing Corp., Defendants-Counter-Claimants-Appellees.
 No. 02-7351.
 United States Court of Appeals, Second Circuit.
 Argued: January 16, 2003.
 Decided: July 21, 2003.
 
 Eugene S. Friedman, (William Anspach, Abigail R. Levy, on the brief), Friedman & Wolf, New York, New York, for Plaintiffs-Counter-Defendants-Appellants.
 Richard B. Ziskin, Law Offices of Robert M. Ziskin, Commack, New York, for Defendants-Counter-Claimants-Appellees.
 Before: WINTER, LEVAL, and CABRANES, Circuit Judges.
 WINTER, Circuit Judge.
 
 
 1
 The Trustees of a local union's benefit funds appeal from Judge Hurley's decision granting summary judgment and holding invalid a policy they adopted regarding the amounts owed by firms in which the owner, or owner's spouse, works as an employee. See La Barbera v. J.D. Collyer Equip. Corp., 98-CV-3818 (E.D.N.Y. May 16, 2001) (Memorandum and Order). We affirm.[1]
 
 BACKGROUND
 
 2
 In the 1990s, Local 282, an affiliate of the International Brotherhood of Teamsters, entered into written collective bargaining agreements with various employers in the heavy construction and excavating industry on Long Island. Five trust funds, all of which are governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., were established as part of these agreements: a Welfare Fund (providing health care coverage), a Pension Fund, an Annuity Fund, a Job Training Fund, and a Vacation and Sick Leave Fund (the "Funds"). Employers are required to contribute to the Funds on behalf of those employees covered by the collective bargaining agreements.
 
 
 3
 The amount of employer contributions required is tied to the number of hours each employee has worked. For example, Section 12(a)-(b) of the 1993-96 and 1996-99 collective bargaining agreements required contributions to the Welfare and Pension Funds "for each hour worked under this Agreement . . . up to a maximum of forty (40) hours per week."
 
 
 4
 The amount of benefits employees receive is also tied to the total number of hours worked by the employees in specified periods. For example, under the Welfare Fund, employees who work 200 hours or more in an employment quarter receive full health care benefits, including full accident and sickness benefits. However, employees can maintain full health care benefits, but not accident and sickness benefits, if they work at least 120 hours in an employment quarter. Employees who work 1,000 hours or more in covered employment in a twelve-month period commencing February 1 and ending January 31 (regardless of the number of hours per quarter) also receive full health care benefits for the following year, beginning March 1 and ending February 28. Employees who fail to meet either the 120-hour quarterly threshold or the 1000-hour yearly minimum lose their health care coverage.
 
 
 5
 As a result of these provisions, employers are required to maintain records that can be audited periodically to confirm the accuracy of the reports submitted. If an employer fails to submit required reports and/or supporting books and records for audit within twenty days after a written demand, Article VI § 1(d) of the Trust Agreement executed by the union, the employers, and the Trustees, authorizes the Trustees to estimate the number of hours worked by the firm's employees. In these circumstances, the Trustees are permitted to compute the amount of contributions due for any month by adding ten percent to the number of hours in the "base month," defined as the month in which the largest number of hours were reported in the previous twelve reports. In the event that there is no determinable base month due to a lack of reports submitted by the employer or no previous audit reports, then employees are deemed to have worked 40 hours per week for the entire unreported period, obligating the employer to make contributions accordingly.
 
 
 6
 We view the evidence in the light most favorable to appellants. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Beginning in the mid-1990s the Trustees perceived that some firms often reported an employee working 120 hours each quarter, the precise minimum amount required to qualify the employee and his family for health care benefits from the Welfare Fund. The Trustees also noted instances where employers falsified the hours worked, sometimes to the point of altering a company's books and records. The Trustees observed that these events often coincided with firms held by "100% owners" — i.e., firms owned by one person, who reported himself or herself, or his or her spouse, to the Funds as an employee of the company, or firms owned wholly by a married couple, with one spouse reported as working for the company.
 
 
 7
 For example, appellees J.D. Collyer Corp. ("Collyer") and Palmo Leasing Corp. ("Palmo") are family owned and operated entities in which the husband is the employee and the wife is the 100% shareholder/employer. In the case of Collyer, the audits revealed that Brenda Collyer had reported her husband, Jeffrey Collyer, as working exactly 120 hours in four of sixteen quarters. In a fifth quarter, she had reported her husband as working 128 hours, and in a sixth quarter, 136 hours. J.A. at 100-06. There was evidence that Brenda Collyer may have inflated her husband's hours as well as shifted hours from a non-familial employee to her husband in order to meet the 120-hour threshold. J.A. at 178, 181, 194-98, 228-30, 242-45, 310-15.
 
 
 8
 The Trustees found a similar pattern of reporting following an audit of Palmo's books and records for the periods July 1, 1994 through August 31, 1998. In fourteen of sixteen quarters, Margaret Palumbo, the 100% shareholder of the corporation, reported that her husband, John Palumbo, had worked between 120 and 152 hours. In seven of those quarters she reported him working at the 120-hour minimum. J.A. at 120-33.
 
 
 9
 In the past, a drop in the average number of hours worked caused the Funds' actuarial consultants to advise the Trustees to raise overall contribution rates to maintain the participants' benefits. The Trustees suspected that the misreporting of hours by 100% owners was contributing to the current increase in the contribution rates required to maintain health coverage for participants eligible for benefits from the Welfare Fund. This may have been the case because ordinary employees who become eligible for benefits will generally have worked substantially more than the minimum hours required and thereby caused the payment of more than the minimum contributions required. The Trustees were also concerned that a lower average number of hours would adversely affect the pensions of future retirees.
 
 
 10
 In response to these concerns, the Trustees adopted a resolution (the "100% owner rule") providing:
 
 
 11
 Effective May 20, 1998, the Trustees hereby resolve that where an Employer has submitted remittance reports to the Funds stating hours have been worked in covered employment by an individual who, alone or with his or her spouse, is a 100 percent owner of the Employer, or by the children, parents or siblings of such 100 percent owner, the employer shall be required to report and pay contributions for each such person for no less than forty (40) hours a week for each week of every month the person has been reported to have worked in covered employment. For each such person, the employer must report forty (40) hours per week for every week in the month, irrespective of the amount of work the person actually performs or the amount of compensation the person receives in a month.[2]
 
 
 12
 On May 28, 1998, and July 22, 1999, the Trustees commenced actions against Collyer and Palmo, respectively, under Sections 502(a)(3) and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3) and 1145, and under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to recover delinquent (under the 100% owner rule) contributions to the five Funds. The action sought retroactive contributions from as far back as 1993 — the 100% owner rule was adopted in May 1998 — with interest. The judgments sought were substantial: in the case of Palmo, at least $172,772.36; in the case of Collyer, at least $96,607.64. The Trustees also filed actions against other 100% owners seeking contributions pursuant to the rule. Ultimately, the fourteen cases were consolidated for the limited purpose of submitting a joint motion for summary judgment to determine the validity of the 100% owner rule. See Note 1, supra.
 
 
 13
 The district court granted appellees' motion and held that the 100% owner rule was arbitrary and capricious as a matter of law. The court held that the collective bargaining agreements did not permit the Trustees to demand contributions for hours not actually worked and that the 100% owner rule exceeded the scope of these agreements by compelling employers to make contributions for hours not worked even in circumstances where the employer had been "scrupulously honest in reporting the hours of work performed ... and making the appropriate contributions." La Barbera v. Collyer, slip op. at 13. This appeal followed.
 
 DISCUSSION
 
 14
 We review de novo the district court's grant of summary judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, Fed.R.Civ.P. 57. Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir.1992).
 
 
 15
 a) Sources of and Limits on the Authority of the Trustees
 
 
 16
 The parties dispute the standard of review to be applied in determining the validity of the 100% owner rule. Appellees argue that the court should review the rule de novo because it modifies the collective bargaining agreements, an act beyond the Trustees' power. Appellants contend that the rule should be reviewed under an arbitrary and capricious standard because ERISA and the Funds' Trust Agreement confer discretion on the Trustees to implement rules regarding the collection of contributions owed by employers so long as they bear a rational relationship to that purpose. Because we find the rule invalid under either standard of review, we need not address this issue further.
 
 
 17
 Whether the 100% owner rule is valid depends upon whether the Trustees have authority under statutory law or under contract rules to adopt it, or whether the rule alters the collective bargaining agreements' framework for determining contributions and benefits. The Trustees' powers are therefore derived from, and limited by, three sources: ERISA, the collective bargaining agreements, and the Trust Agreement. ERISA of course trumps the collective bargaining and Trust agreements in the case of a conflict. The collective bargaining and Trust agreements are interrelated and overlap, but, because we find no true conflict between them in the present circumstances, we need not discuss the problems that such a conflict might generate.
 
 
 18
 Under ERISA, the Trustees have a fiduciary obligation to preserve and maintain the assets of the Funds, see 29 U.S.C. §§ 1102-1103, and are vested with the "exclusive authority and discretion to manage and control the assets of the plan," 29 U.S.C. § 1103(a). We also note that ERISA requires employers to keep records of their employees' hours in order to permit the calculation of benefits due. See 29 U.S.C. § 1059(a)(1) ("every employer shall ... maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees"); Combs v. King, 764 F.2d 818, 822-25 (11th Cir.1985).
 
 
 19
 The collective bargaining agreements provide the framework for calculating the contributions owed by employers and the benefits owed to employees. As noted, both employer contributions and employee benefits are determined by the hours a particular employee works.
 
 
 20
 The Trust Agreement vests the Trustees with broad discretion to locate and preserve the assets of the Funds. See, e.g., Article V, § 4(o) ("The Trustees are hereby empowered ... [t]o do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder."). Article II, § 3 directs the Trustees to "promptly agree upon and formulate the provisions, regulations and conditions of the welfare plan herein contemplated, including definitions relating to eligibility of Employees, their wives and children, waiting periods, full-time employment and any or all other matters relating thereto which the Trustees may deem appropriate for the determination of benefits and the administration of the program."
 
 
 21
 Of particular relevance is Article VI, § 1(d), which, as noted above, gives the Trustees authority to determine contributions when an employer fails to present adequate records by adding 10% to the largest number of hours reported in any of the last 12 months. Where there are no records available for that determination, the Trustees are empowered to deem that employees have worked 40 hours per week for the period in question.
 
 
 22
 b) Application
 
 
 23
 We hold that neither ERISA, the collective bargaining agreements, nor the Trust Agreement vest the Trustees with authority to adopt the 100% owner rule. As noted, because we are reviewing a grant of summary judgment, we view the evidence in the light most favorable to the non-moving party.
 
 
 24
 We therefore accept for purposes of this decision the Trustees' claims that they had cause to believe that some 100% owners misreported hours to meet quarterly and annual benefit thresholds and that some concealed and/or fraudulently altered records necessary for an accurate audit. We also accept as true the Trustees' claims that the misreporting of hours has negatively affected the soundness of the Funds' actuarial basis and necessitated an increase in employer contribution rates. Finally, for these purposes, we agree with the Trustees that a failure to take all legally available measures to collect delinquent contributions and interest owed to the Funds would constitute a breach of their fiduciary duties. See Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 287 (2d Cir.1992); Liss v. Smith, 991 F.Supp. 278, 290-91 (S.D.N.Y.1998). However, none of these concerns supports the adoption of the 100% owner rule.
 
 
 25
 First, we recognize the broad powers of the Trustees under ERISA and the Trust Agreement to locate and protect the assets of the Funds, including employer contributions owed to the Funds. However, the 100% owner rule is not a measure tailored to ensure employer compliance with the contributions-per-hour-worked rules under the collective bargaining agreements. It does not even purport to substitute good faith estimates of the truth for false reports or to provide a formula to be used when no reports are available. Unlike Article VI, § 1(d), the 100% owner rule requires no showing of false or non-existent records for a particular period of time to trigger its application. Rather, the rule applies no matter how accurately or in what detail the firm reports hours worked by an owner/employee and flatly dictates that if an owner/employee works any hours in one week, the firm must report and pay contributions to the Funds as though 40 hours were worked each week in that month. See Note 2, supra. The truth simply does not matter.
 
 
 26
 We see nothing in ERISA or the Trust Agreement that authorizes the Trustees to substitute an automatic and draconian levy on a narrow class of employers for the per-hours-worked rules set out in the collective bargaining agreements or for the remedial steps available under Article VI, § 1(d). Moreover, we note that the 100% owner rule exceeds any measure necessary to prevent actuarial damage through cheating because it applies even when the hours reported — e.g. one hour in a year — would not qualify an owner/employee for benefits.
 
 
 27
 Second, because the 100% owner rule commands a reporting of 160 or 200 hours worked each month (if any hours are to be reported) even if that number is indisputably false, the effect is a substantial modification of the collective bargaining agreements with regard to the cost of, and eligibility for, benefits in the case of owner/employees and their families. It is true that the collective bargaining agreements as drafted give owner/employees considerable discretion as to when and how much they will work in order to qualify for benefits. Ordinary employees generally must rely on being asked by an employer to work the hours required to qualify and may have to agree to work far more than the minimum. For the latter reason, most employees eligible for benefits will have worked more than the minimum required hours and will have caused the payment of more than the minimum employer contributions to the Funds. By contrast, owner/employees may be able to choose to work the minimum number of hours required for eligibility. However, this is a practice allowed by the collective bargaining agreements. While the Trustees have broad powers to adopt regulations regarding eligibility, see supra, those powers do not extend to abandoning the link between eligibility and hours worked by an employee, save for the remedial provisions of Article VI, § 1(d). It may be the case that the discretion of owner/employees should be cabined or that different eligibility rules should apply to owner/employees, but those are decisions for collective bargaining, not for the Trustees. The Trustees have no power from any source to remedy perceived inequities in the cost of, and eligibility for, benefits for owner/employees and their families.
 
 
 28
 Indeed, we note that the substantive effect of altering the eligibility rules is aggravated by its limited application to a small group of firms with particular ownership characteristics. Were we to recognize a power in benefit plan trustees to work such changes without some authority from ERISA, a collective bargaining agreement, or a trust agreement, we would open the door to measures by plan trustees that might drive selected, disfavored employers out of business. There is nothing in the present record to suggest any such motive underlying the 100% owner rule. However, the ability of owner/employees to monitor and report on their activities as "employees" may seem to threaten union wage and benefit scales in various ways — to the detriment of union workers and their employers who must compete with the owner/employees — as is claimed here with regard to the soundness of the Welfare Fund's actuarial basis and the need for increased employer contribution rates.
 
 
 29
 In sum, we find that the 100% owner rule is not authorized either by the broad powers accorded Trustees under ERISA and the Trust Agreement to locate and collect contributions owed to the funds or by the significant but carefully limited powers of the Trustees under Article VI, § 1(d) to deem that particular hours have been worked. The 100% owner rule deems particular hours to have been worked no matter how accurate and detailed the reports or what the demonstrated facts. The rule also modifies the collective bargaining agreements by varying the cost of, and eligibility for, benefits for owner/employees.
 
 
 30
 We of course say no more than that the 100% owner rule as formulated is invalid because it is not expressly or impliedly authorized by either ERISA, the collective bargaining agreements, or the Trust Agreement. And, certainly, we do not foreclose remedies more appropriately tailored to preventing false reporting by 100% owners.[3]
 
 
 31
 We therefore affirm.
 
 
 
 Notes:
 
 
 [1]
 Appellants conceded at oral argument that our decision in this case will constituteres judicata as to the decisions in other similar cases consolidated before the district court: La Barbera v. Alert Leasing Corp., 99-CV-4093 (ADS); La Barbera v. Alto Enterprises, Inc., 99-CV-1704 (DRH); La Barbera v. Hubbard Equipment Corp., 99-CV-4326 (DRH); La Barbera v. J.P.M.P. Bikes, Inc., 99-CV-4097 (LDW); La Barbera v. Roban Equipment Leasing Corp., 99-CV-4323 (LDW); La Barbera v. Speedway Freight Carriers, Inc., 99-CV-4098 (CBA); La Barbera v. 5 Bros. Trucking Corp., 99-CV-4099 (TCP); La Barbera v. DAC Enterprises, Inc., 99-CV-4651 (NGG); La Barbera v. Horan Sand & Gravel Corp., 99-CV-5739 (TCP); La Barbera v. Laurelwood Landscape Construction, Inc., 99-CV-7885 (ADS); La Barbera v. Mearnzy, Inc., 00-CV-1970 (ADS); La Barbera v. CAR Trucking, Inc., 00-CV-2747 (JS).
 
 
 [2]
 For example, in February 1996, Palmo reported that John Palumbo, the husband of Palmo's 100% owner, worked 8 hours. The Trustees deemed that Palumbo worked 160 hours in that month — 40 hours per week for each week — and charged Palmo for contributions on that basis. J.A. at 122. In theory, the spouse of a 100% owner who worked one hour in a month would be deemed to have worked 40 hours each week for the whole month, which would amount to 160 or 200 hours depending on the length of the month
 
 
 [3]
 For example, we note that some courts have held that once trustees to an ERISA fund produce evidence raising genuine questions about the accuracy of a particular employer's records, the burden shifts to the employer to show the precise amount of work performedSee Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc., 30 F.3d 692, 696 (6th Cir.1994); Brick Masons Pension Trust v. Indus. Fence & Supply, Inc., 839 F.2d 1333, 1338 (9th Cir.1988); Combs, 764 F.2d at 827.