*New York State Nurses Association Benefits Fund v. The Nyack Hospital*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2020

(Argued: February 22, 2021     Decided: August 19, 2022)

Docket Nos. 20-378, 20-425

NEW YORK STATE NURSES ASSOCIATION BENEFITS FUND, THROUGH THE
CHAIRPERSON OF THE BOARD OF TRUSTEES, DENNIS BUCHANAN, AND THE
SECRETARY OF THE BOARD OF TRUSTEES, NANCY KALEDA,

*Plaintiff–Appellant-Cross-Appellee,*

–v.–

THE NYACK HOSPITAL,

*Defendant-Appellee-Cross-Appellant.*

Before:

CARNEY and NARDINI, *Circuit Judges*, and LIMAN, *District Judge.*\*

This case concerns the scope of the audit authority of a multi-employer employee benefit fund covered by the Employee Retirement Income Security Act ("ERISA"). The

---

\* Judge Lewis J. Liman of the United States District Court for the Southern District of New York, sitting by designation.

New York State Nurses Association Benefit Fund (the "Fund") sought an audit of the Nyack Hospital's (the "Hospital's") payroll and wage records. The Hospital objected, claiming that the Fund had the authority to inspect only the payroll records of employees the Hospital identified as members of the collective bargaining unit. The district court (Briccetti, *J.*) held that the Fund was entitled to the records of all persons the Hospital identified as registered nurses but not to the records of any other employees.

We reverse in part and affirm in part. To the extent the district court granted the Hospital's cross-motion for summary judgment and denied the Fund's motion for summary judgment, we reverse. To the extent the district court granted the Fund's motion for summary judgment and denied the Hospital's cross-motion for summary judgment, we affirm. We hold that the audit sought by the Fund was authorized by the Trust Agreement, and that the Hospital did not present evidence that the audit constituted a breach of the Fund's fiduciary duty under ERISA. Accordingly, the audit was within the scope of the Fund trustees' authority under the Supreme Court's decision in *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559 (1985).

REVERSED IN PART AND AFFIRMED IN PART.

Judge Carney dissents in part in a separate opinion.

———————

JAY P. WARREN (Kyle P. Flaherty, *on the brief*), Bryan Cave Leighton Paisner LLP, New York, NY, *for New York State Nurses Association Benefits Fund*.

JOHN HOUSTON POPE (James S. Frank, *on the brief*) Epstein Becker & Green, New York, NY, *for the Nyack Hospital*.

———————

LIMAN, *District Judge*:

New York State Nurses Association Benefits Fund (the "Fund" or the "Plan") appeals from an order of the district court (Briccetti, *J.*), granting in part and denying in part its motion for summary judgment and determining the scope of the payroll records of Nyack Hospital ("Nyack" or the "Hospital") to which the Fund was entitled in

2

connection with an audit of Nyack. The district court held that the Fund was entitled to only the payroll records of persons identified by Nyack as potential Plan beneficiaries, i.e., registered nurses ("RNs"), and not to the records of other employees to determine whether they should have been classified as Plan beneficiaries. The Fund appeals, arguing that the district court erred in narrowing the audit and holding that Nyack was required under an agreement governing the Fund (defined herein as the Trust Agreement) to provide only the payroll records of persons Nyack identified as RNs. Nyack cross-appeals, arguing that the district court authorized an audit that was too broad and that the Fund is entitled to audit only the records of those employees Nyack has identified as members of the collective bargaining unit. For the following reasons, the decision of the district court is AFFIRMED IN PART and REVERSED IN PART.

## BACKGROUND

The following facts are taken from the summary judgment record and were undisputed in the district court. They are taken as undisputed for purposes of this appeal.

### I.  The Parties' Agreement

The Fund is a multiemployer fringe benefit fund governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). The Fund provides health and welfare benefits to employees of hospitals that are parties to collective bargaining agreements ("CBAs") with the New York State Nurses Association ("NYSNA"). The Fund is governed by the Second Amended and Restated Agreement and Declaration of Trust Establishing the New York State Nurses Association Benefits Fund (the "Trust Agreement").

Nyack is a hospital serving the Rockland County area. It has approximately 1,400 full- and part-time employees. It is a party to a CBA with NYSNA that covers

3

certain of its employees and was signed on October 5, 2016.[1] The CBA "covers all full-time, regular part-time and per diem registered professional nurses employed by [Nyack], including every person lawfully authorized by permit to practice as a registered professional nurse" with certain exclusions set forth in the CBA. A-150. Three other unions also have CBAs with Nyack; these CBAs cover other groups of its employees.

Several provisions of the CBA are relevant here. Section 9 of the CBA makes regular full-time and part-time employees eligible for coverage under the Fund. Per diem employees and temporary employees are not eligible for health benefits.[2] No persons other than those represented by NYSNA are eligible for participation in the Fund. Section 9 of the CBA also requires Nyack to "contribute to the [Fund] an annual sum paid in monthly increments uniformly required by the Fund to provide health and welfare benefits for covered employees." Section 9.01(A)(4) of the CBA requires Nyack to provide to the Fund trustees (the "Trustees") "such documentation with respect to the Employees covered by the . . . Fund as may reasonably be necessary to establish the validity of claims made on the . . . Fund or the number of and identity of such Employees for whom contributions were made during the term of this [CBA]." A-171. The CBA also provides that (1) the Fund Trustees have "[t]he sole and exclusive

---

[1] On April 29 and April 30, 2014, NYSNA and Nyack entered into a Memorandum of Agreement ("MOA") stipulating that, effective June 30, 2014, Nyack would begin making contributions to the Fund to provide health and welfare benefits for covered employees. A-65–A-66, A-301–A-308. The "Scope" provision of the MOA stated that the agreement covered "all full-time, regular part-time and per diem registered professional nurses employed by the Hospital, including every person lawfully authorized by permit to practice as a registered professional nurse and every person employed in a position which requires a registered professional nurse," excluding "supervisory, managerial and administrative employees" and "all other employees employed by the Hospital" (the "Bargaining Unit"). A-150.

[2] The CBA defines regular full-time, regular part-time, and per diem employees.

4

authority . . . to determine the benefits to be provided to . . . Fund participants and to make changes thereto"; (2) the Fund "shall be held and administered under the terms and provisions of the existing Trust Fund Agreement and any amendments thereof"; and (3) nothing in the CBA is to be construed to be inconsistent with the provisions of the Trust Agreement, "except as otherwise specified in the Acknowledgment of Trust Agreement provided by the . . . Fund Trustees." A-173.

The Trust Agreement sets forth the rights of the Trustees and certain corresponding obligations of employers who are bound by it. Nyack agreed "to be bound by the [Trust Agreement], as amended from time to time." A-232. It did so in an acknowledgment of Trust Agreement [A-171] (the "Acknowledgment"), which the CBA required it to sign.

There are no qualifications or amendments to the Trust Agreement. Article V of the Trust Agreement requires Nyack (like other Employers), to "contribute to the Fund the amount required by the collective bargaining agreement" between NYSNA and Nyack including Employee Contributions "consistent with the employee premium option adopted by [Nyack] and [NYSNA] in bargaining." A-119. The rate of "Employer Contributions" is governed by the CBA.

The Trust Agreement gives the Trustees of the Fund broad authority. They have discretion to interpret the terms of the Trust Agreement: "The Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein and any construction adopted by the Trustees in good faith shall be binding upon [NYSNA], [Nyack], and the Employees and their families and dependents." A-113. The Trustees are authorized to "do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder" or "necessary to accomplish the general

5

objective of enabling the Employees to obtain welfare benefits in the most efficient and economical manner." A-114.

Finally, what gives rise to this case is the Trust Agreement's audit provision. The Trust Agreement permits the Trustees to conduct an audit in connection with Employer Contributions and Employee Contributions:

> 5. <u>Report on Employer Contributions</u>. The Employers shall make all reports on Employer Contributions and Employee Contributions required by the Trustees. The Trustees may, at such times and places as may be appropriate, have an audit made by independent certified public accountants of the payroll and wage records of any Employer in connection with the said Employer Contributions, Employee Contributions, and/or reports.

A-121–A-122.

## II.     The Audit Request

In the district court, the Fund submitted the affidavit of its Chief Operating Officer, Christopher Rosetti. Rosetti averred that the Trustees were required "to assure the financial integrity of the fund" and that, as an officer of the Fund, he was responsible for ensuring "that every eligible participant receives" all documents, reports, and other communications mandated by ERISA. A-78–A-79. "[T]his responsibility extends to every person *eligible* to participate in the Fund – not just those people who are already actively participating in the Fund or who are being reported on by the contributing employers." A-79.

To help the Trustees discharge their fiduciary duties, the Fund—like other multiemployer fringe benefit funds—engages in payroll auditing (also known as compliance auditing). Payroll auditing is used to determine whether employers are making the required contributions on behalf of all eligible participants in the Fund. "[M]any multiemployer benefit funds rely on employer self-reporting – meaning, the

employers themselves report to the funds the extent of their own contribution obligations to the fund." A-80. The Fund and its Trustees "monitor this self-reporting by periodically auditing the participating employers' payroll and wage records to make sure that the employers' reporting [is] accurate and that all contributions [are] properly remitted." *Id.* According to Rosetti,

> [t]he funds need to monitor the employers' reports and contributions because, <u>e.g.</u>, an employers' [sic] failure to report all covered employees may prevent funds from notifying participants and beneficiaries of their rights under the fund, an employer's failure to contribute for an eligible employee may negatively impact the financial integrity of the fund, and because the fund's and the employers' interests are not completely aligned (i.e., it would be advantageous for an employer to underreport the number of its covered employees because that would reduce the amount of contributions that the employer owes to the fund).

A-80.

Every year, the Fund's accounting department selects six of the numerous employers that employ Fund beneficiaries for a payroll audit. The auditors perform the audit according to "agreed-upon procedures" ("AUP"), by which the Fund dictates the scope of the audit and then works with the auditors to determine the sample size and the procedures. A-79–A-80.

On May 12, 2016, the Fund sent a letter to Nyack notifying it that the Fund's auditors intended to review Nyack's payroll and related data. The audit would be the Fund's first audit of Nyack, which had joined the Fund in 2014. On May 13, 2016, the Fund emailed Nyack a set of AUPs with a request list, which asked for, among other items, "the May 2015 payroll register(s) for [Nyack] (should be inclusive of all employees, not just the NYSNA group)," "a detail listing of all employees hired during the year ended December 31, 2015 (should be inclusive of all employees, not just the NYSNA group)," "a detail listing of all employees terminated during the year ended December 31, 2015 (should be inclusive of all employees, not just the NYSNA group),"

7

and personnel records for a sample of employees that included their job classification. A-241.

On May 23, 2016, Nyack responded with the list of all active members in the collective bargaining unit covered by the CBA with NYSNA but expressed reservations about providing documents concerning employees who were not members of the collective bargaining unit. The Fund replied that it needed the records of all employees "in order to independently verify who the [NYSNA]-collectively bargained employees are." A-255. The Fund stated that "[o]therwise it is impossible for [the auditors to] independently verify what has been represented" and that the request was "[s]tandard for any audit performed by an independent audit firm." *Id.* The Fund invoked its authority under Article V of the Trust Agreement. *Id.* In subsequent emails, the Fund's Chief Operating Officer stated that "the payroll information requested and reviewed by the auditors is not shared by them with us, or anyone else" and asked whether Nyack would accept a confidentiality agreement from the auditors. A-260.

In August 2016, Nyack and the Fund's auditor signed an engagement letter, which specified "agreed-upon procedures" for the audit and stated: "This engagement is solely to assist the Board of Trustees . . . of the Fund in evaluating the accuracy and completeness of [Nyack's] monthly contribution reports, including the extent of compliance with the Fund contribution requirements in the collective bargaining agreement between [Nyack] and [NYSNA]." A-265.

## III. The Dispute

By email dated September 9, 2016, the auditor requested that Nyack provide: (1) a list of employees who were hired in 2015; (2) a list of employees who were terminated during 2015; (3) a job classification code for each department; (4) the monthly payroll registers that would be selected for the sample; and (5) the employee

8

personnel files that would be selected for the sample (the "September 9, 2016 Request"). By follow up email, the auditor asked whether a signed confidentiality agreement would permit Nyack to provide the records for all employees. In response, Nyack advised the auditor that it would "supply the payroll information for only the employees covered under the NYSNA cba." A-297.

In response, counsel for the Fund sent a letter to Nyack demanding that the auditor be permitted to examine all of the necessary documents. Nyack replied that it would allow the auditor to look at only the payroll records of Nyack employees who were RNs and participants in the Fund.

## IV. The Litigation

The Fund commenced this action against Nyack on March 15, 2017, alleging that Nyack's failure to comply with Article V of the Trust Agreement constituted a breach of contract and a violation of ERISA and the Labor Management Relations Act of 1947, 29 U.S.C. § 141, *et seq.*, and seeking an order requiring Nyack to produce "all books and records" necessary for it to perform the audit examination pursuant to the Trust Agreement and ERISA, as well as monetary relief. A-29. The Fund alleged that, without the requested payroll records, (1) it would not be able to determine the full amount of unpaid contributions owed to the Fund by Nyack; (2) the employee-beneficiaries of the Fund would suffer injury because the Fund would be required to deny welfare benefits to employee-beneficiaries for whom required contributions had not been made; and (3) the Fund would be required to provide to employees benefits provided for under the Trust Agreement even if Nyack failed to make the required contributions, thereby reducing the corpus of monies administered by the Fund and endangering the rights of the employee-beneficiaries in the future. The Fund additionally alleged that, in the event Nyack was found delinquent in its contributions,

9

the Fund would be entitled to: "(a) the contributions found delinquent for the period January 1, 2015 through December 31, 2015; (b) liquidated damages of twenty percent (20%) on all delinquent contributions; (c) interest at the rate of one and one-half percent (1.5%) per month; (d) audit costs; (e) reasonable attorney's fees, costs and expenses; (f) along with such other legal and equitable relief as the Court deems appropriate." A-26.

Nyack moved to dismiss, arguing that the Fund's audit request was overbroad and impermissible under the CBA. By opinion and order of April 30, 2018, the district court denied the motion without prejudice. It held that Nyack had contractual obligations both under the CBA and under the Trust Agreement, that the terms of the Trust Agreement governed over those of the CBA where the two were inconsistent, that the Trustee's good-faith construction of the Trust Agreement was entitled to deference, and that Nyack was "subject to audit at the Fund's request, provided the Fund has construed its authority in good faith." A-37. The court then, however, stated that it was "perplexed" as to the extent of the request "[i]n view of the scope provision of the 2013 CBA" and determined that "on the current record, [it could] not conclude the requested audit [was] broader in scope than necessary to achieve its objective." A-38 (internal quotation marks and citation omitted). The district court did not address whether the documents requested were within the terms of the Trust Agreement.

The parties then cross-moved for summary judgment. The Fund argued that, under the terms of the Trust Agreement, its auditors were entitled to look at the payroll records of all of Nyack's employees. Nyack argued that the Fund was entitled to an audit only of the payroll records of RNs who were part of the collective bargaining unit.

The district court granted in part and denied in part both parties' motions for summary judgment. *N.Y. State Nurses Ass'n Benefits Fund v. Nyack Hosp.*, 2019 WL 4735355 (S.D.N.Y. Sept. 27, 2019). The court observed that "when authorized contractually or under common law, the right to audit is not unlimited—indeed,

10

trustees may not abuse that right." *Id*. at *4. It proceeded to hold that the Fund was not entitled to records beyond those of persons whom Nyack identified to be RNs because the Fund had "not presented evidence that its proposed audit of all of Nyack's employees, as opposed to just Nyack's registered nurses, would further its two alleged purposes: (i) to determine whether Nyack was accurately reporting the duties and status of its employees, and thereby verify that all required contributions are being made on behalf of covered employees; and (ii) to identify all plan participants and beneficiaries and make them aware of their status and rights under the plan." *Id*. at *6. The district court concluded that there is no evidence that (1) "an audit of all of Nyack's employees' payroll records, as opposed to just registered nurses, would lead to the discovery of unfunded liabilities"; and (2) "the payroll records of non-registered nurses would allow the Fund to identify additional plan participants." *Id*. At the same time, it held that the records of all RNs were required to determine whether Nyack was accurately reporting the membership of the class defined by the Fund's terms because the CBA contained several exceptions to the types of covered RNs. The court did not identify any evidence presented by Nyack that the audit request represented an effort by Fund Trustees to expand Fund coverage beyond the class defined in the Fund's terms, that it was an effort to acquire information about the employer to advance union goals, that executing the audit would result in a waste of Fund assets, or that the audit request was unrelated to legitimate Fund goals.

## DISCUSSION

On appeal, both parties seek reversal in part of the district court's decision. The Fund maintains that the terms of the Trust Agreement entitle it to the records set forth in the September 9, 2016 Request, including the payroll registers of all of Nyack's employees, plus more detailed samples of individual employee payroll records. Nyack argues that the district court erred and that the Fund is entitled to audit the payroll

11

records only of those employees who are members of the collective bargaining unit. In other words, the Fund argues that the audit is now too narrow, while Nyack argues that it is still too broad. We agree with the Fund.

## I. Standard of Review

The Court reviews a district court's grant or denial of summary judgment *de novo* "to determine whether genuine issues of material fact exist requiring a trial." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted); *see also Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Terms of a collective bargaining agreement are reviewed *de novo*. *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005). "The interpretation of collective bargaining agreements is governed by federal law; however, traditional contract interpretation rules are applied if they are consistent with federal labor policies." *Plumbers & Steamfitters Loc. No. 150 Pension Fund v. Vertex Constr. Co.*, 932 F.2d 1443, 1448 (11th Cir. 1991) (citing *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983)).

## II. The Supreme Court's Decision in *Central States*

The starting point for analyzing the scope of an ERISA-covered plan's audit authority is the Supreme Court's decision in *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559 (1985) ("*Central States*"). In *Central States*, two multiemployer benefit plans providing health, welfare, and pension benefits to employees performing work covered by collective bargaining agreements sought to audit the records of certain employers who were parties to collective bargaining agreements requiring them to make contributions to the plans. The benefit plans

12

argued that (1) because they relied principally on employer self-reporting to determine the extent of an employer's liability, they police "this self-reporting system by conducting random audits of the records of participating employers"; and (2) the audit was necessary "independently to determine the membership of the class entitled to participate in the plans, and thus to verify that Central Transport was making all required contributions." *Id.* at 562–63. The employer argued that, because 60% of its employees were not participants in either of the plans, the plans had no right to examine any records of noncovered employees. *Id.* at 563.

The Court started its analysis from the language of the trust agreement, which authorized the trustees to "do all acts, whether or not expressly authorized . . ., which [they] may deem necessary or proper for the protection of the property held [under the trust agreement]." *Id*. at 565 (alterations in original). Further, the trust agreement stipulated that: "The Trustees may, by their representatives, examine the pertinent records of each Employer at the Employer's place of business whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the Trust." *Id*. at 566. The Court concluded that "the trustees' right to conduct the audit in question would seem clear" under the terms of the trust agreement. *Id*. at 568.

The *Central States* Court also concluded that the trustees' interpretation of the trust agreement, insofar as it permitted them to review records of persons who were not participants, was "entirely reasonable in light of ERISA's policies." *Id.* at 569. "ERISA clearly assumes that trustees will act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries, and that trustees will take steps to identify all participants and beneficiaries, so that the trustees can make them aware of their status and rights under the trust's terms." *Id.* at 571–72. The concerns offered by the plan "to justify its audit program" were consistent

13

with ERISA: "Both the concern for fully informing participants of their rights and status under a plan and the concern for assuring the financial integrity of the plans by determining the class of potential benefit claimants and holding employers to the full and prompt fulfillment of their contribution obligations are proper and weighty within the framework of ERISA." *Id.* at 574.[3]

The Court did not stop there, however. It also stated that "trust documents cannot excuse trustees from their duties under ERISA," *id.* at 568, and it made clear that a court should not enforce an audit request when the implementation of such a request would breach the trustees' duties of loyalty or prudence, *id.* at 571 n.12. It noted that an audit request "would be illegitimate under the standard of loyalty if it were actually an effort by plan trustees to expand plan coverage beyond the class defined in the plans' terms or to acquire information about the employers to advance union goals" and that the audit might be "imprudent if it were clearly wasteful of plan assets or unrelated to legitimate plan concerns." *Id*. But the employer in *Central States* had "submitted no evidence that [the] audit program's actual goal was to expand the trust's coverage beyond that provided in the applicable collective-bargaining agreements or to acquire information for union goals; nor did it submit any evidence that the audits were unjustifiably costly." *Id.* In the absence of such evidence, "whether the auditing power claimed by Central States is consistent with ERISA must be analyzed in terms of the

---

[3] The Court observed that ERISA requires benefit plans "to furnish all participants with various documents informing them of their rights and obligations under the plan, a task that would certainly include the duty of determining who is in fact a plan participant." *Id*. at 572 (citation omitted); *see also id*. at 567 ("Moreover, an employer has an incentive to underreport the number of employees covered, because such underreporting would reduce his liability to the plans.") The Court also noted that "[t]he provisions of ERISA make clear that a benefit plan trustee is . . . subject to these responsibilities, not only as a result of the general fiduciary standards of loyalty and care, borrowed as they are from the common law, but also as a result of more specific trustee duties itemized in the Act." *Id*. at 572.

goal upon which Central States has rested its audit, that of policing [the employer's determination of eligible plan participants covered by the CBA to verify that the employer was contributing all required amounts on behalf of all covered employees]." *Id.* As long as the plan's goal was consistent with ERISA, the Court looked no further to determine whether it was imprudent or a breach of the duty of loyalty.

## III.  Application of the *Central States* Framework

*Central States* thus requires this Court to analyze first the language of the Trust Agreement to which both the Fund and Nyack are bound in order to determine whether the audit is within the scope of what is permitted under the Trust Agreement. Then, if the audit falls within the four corners of what is permitted, we turn to whether the party resisting the audit has offered evidence that the audit request was actually an effort by the Trustees to expand Fund coverage beyond the class defined in the Fund's terms or to acquire information about the employers to advance union goals, or whether the audit itself was clearly wasteful of Fund assets or unrelated to legitimate Fund concerns. *Central States* did not charge the district court with the responsibility to comb through each document requested as part of a contractually authorized audit and to determine whether that document was strictly necessary for the auditors to do their jobs.

### 1.  Whether the Audit Was Contractually Authorized

Under the *Central States* framework, the analysis here is straightforward, and most of it is undisputed. To begin with, the Trust Agreement (by which Nyack agreed to be bound) authorized the Trustees "at such times and places as may be appropriate, [to] have an audit made by independent certified public accountants of the payroll and wage records of any Employer in connection with the said Employer Contributions, Employee Contributions, and/or reports." A-122. There is no dispute that Nyack is an

15

"Employer" within the meaning of the Trust Agreement. There also is no dispute that the audit was to be conducted by independent certified public accountants. Nor is there any dispute that the proposed audit would have been "in connection with the said Employer Contributions, Employee Contributions, and/or reports." *See* Dkt. No. 60 ¶¶ 7, 16, 28, 29. The "in connection with" language is read most naturally to refer to the objective of the audit and not to qualify the payroll and wage records. Here, it is not disputed that the objective of the audit was to determine that Nyack was making contributions for all of the employees for whom contributions were required.

The only disputed legal question with respect to the Trust Agreement is whether the materials requested fell within the meaning of "the payroll and wage records of any Employer" as set forth in the Trust Agreement. The Court must assume the Trust Agreement's choice of words was advised. The language of the Trust Agreement is phrased in broad terms, without any words of limitation. In describing the categories of documents to which the Trustees are entitled, it uses the phrase "the payroll and wage records" of the Employer, and not just "payroll and wage records" of the Employer; nor does the language of the Trust Agreement limit the scope of the audit authority to some subset of the payroll and wage records of the Employer. It very well might have done so had the parties intended to give the Employer the authority to determine what payroll and wage records were necessary, or had they intended to limit the documents to which the Trustees were entitled in connection with an audit of the records of RNs. The Trust Agreement elsewhere defines "Employees" as "all persons covered by a collective bargaining agreement between an Employer and the [NYSNA]," i.e., the RNs in the case of Nyack. A-102. The parties could have chosen to limit the documents to which the Trustees were entitled to "the payroll and wage records of Employees." They chose not to do so, and it is not within the province of the Court to rewrite their agreement for them. They chose instead to use the definite article "the," connoting that

16

the Trustees were entitled, in connection with an audit of Employer or Employee Contributions, to the set of payroll and wage records and not some subset of those records. *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("[G]rammar and usage establish that 'the' is 'a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context.'" (alteration in original) (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005))); *see also Noel Canning v. N.L.R.B.*, 705 F.3d 490, 500 (D.C. Cir. 2013) ("[T]he word 'the' . . . is a definite article. . . . Unlike 'a' or 'an,' that definite article suggests specificity.").

The interpretation is reinforced by comparing the language of Article V to language used in the CBA, pursuant to which Nyack agreed to become obligated to the Trust Agreement. In setting forth certain information required to be provided to the Fund Trustees (without the requirement that it be part of an independent audit) the CBA uses more limited language: Nyack must provide the documentation "as may reasonably be necessary to establish the validity of claims made on the . . . Fund or the number of and identity of such Employees for whom contributions were made during the term of [the CBA]." A-171. In setting forth the records Nyack was required to provide as part of an independent audit in connection with Employer Contributions or Employee Contributions, the Trust Agreement tellingly uses far broader language: "the payroll and wage records of any Employer." A-122. The parties intended that the Trustees be entitled to more than just the documents "reasonably necessary" to establish the validity of claims or the number of and identity of Employees for whom contributions were made. The parties did not intend to require the auditor to justify to a court that each of its requests were "reasonably necessary" in defining the materials to which the auditors were entitled. Rather, the Trust Agreement reflects the intent that the auditors receive the payroll and wage records of the Employer that the *auditors*

17

determine they need, at least in the absence of proof by the Employer of a breach of fiduciary duty.

Nyack argues that the language of the Trust Agreement should be narrowed and restricted to what it was required to provide under the CBA. Similarly, the dissent suggests that an "expansive" reading of the Trust Agreement is "undercut by the CBA." Dissenting Op. at 8. But, if Nyack intended to limit its production obligations, the place in which to have done so would have been in the Acknowledgment (in which it agreed to be bound by the Trust Agreement). The CBA provides that, to the extent there was a conflict between the two documents, the Trust Agreement—and not the CBA—would govern "except as otherwise specified in the Acknowledgment of Trust Agreement provided by the . . . Fund Trustees." A-173. The Acknowledgment that Nyack signed contains no such limitation; Nyack subscribed to the obligations of Article V in full. Having done so, the room is not now open for Nyack to argue that the language of Article V should be further limited in light of the CBA.[4]

Finally, Nyack agreed to give the Trustees broad authority to interpret their audit authority. The Trust Agreement here, as did the *Central States* trust agreement, provides that: "The Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and terms used herein and any construction adopted by the Trustees in good faith shall be binding upon [NYSNA], the Employer,

---

[4] Nyack argues in its reply that the language of the Trust Agreement should be read in light of the language in the CBA that requires reports of the contributions made on behalf of bargaining unit members and opt-outs. Nyack's Reply Br. at 12–14. This argument is a non-sequitur. The relevant provision of the Trust Agreement addresses the authority of the Fund to conduct audits, while the provision of the CBA that Nyack cites addresses the requirement that Nyack make contribution reports. There is no reason to find that the contractual provisions fixing the scope of Nyack's reporting requirements dictate the scope of the Fund's audit authority, which is set by separate contractual provisions.

18

and the Employees and their families and dependents." A-113; *cf. Central States*, 472 U.S. at 568 ("[A]ny construction [of the agreement's provisions] adopted by the Trustees in good faith shall be binding upon the Union, Employees and Employers." (second alteration in original)). A trustee of an ERISA-covered employee benefit plan may be empowered by the terms of the trust agreement to interpret the terms of that agreement. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989) ("A trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable."). Thus, to the extent there is any ambiguity in the language of Article V, that ambiguity must be resolved in favor of the good faith construction of the Trustees, which is binding on Nyack. *See Central States*, 472 U.S. at 568 ("The trustees' determination that the trust documents authorize their access to the records here in dispute has significant weight, for the trust agreement explicitly provides that 'any construction [of the agreement's provisions] adopted by the Trustees in good faith shall be binding.'" (alteration in original)).[5]

---

[5] Nyack argues that there is no construction of the Trustees for them or the Court to defer to because the Fund failed to produce in this litigation a corporate resolution adopted by the Trustees and maintains that the interpretation of the Trust Agreement put forward by the Fund constitutes "nothing more than an agency's convenient litigating position." Nyack's Reply Br. at 11 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988)). But case law governing federal agency interpretations, which is premised on the Administrative Procedure Act, is irrelevant. In contrast to agency decision-making, the authority of individual Trustees to make decisions on behalf of the Trustees is a function of the Trust Agreement. *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. United Parcel Serv., Inc.*, 382 F.3d 272, 281 (2d Cir. 2004) ("[T]he rulemaking authority of a multiemployer plan is limited by the terms of the plan's creation documents." (citing *La Barbera v. J.D. Collyer Equip. Co.*, 337 F.3d 132, 137–39 (2d Cir. 2003))). There is no dispute here that audits are under the purview of the Audit Committee and that the payroll auditing procedures at issue were adopted by the Audit Committee. Under the Audit Committee Charter, action is authorized if it is taken by a quorum consisting of one Association Trustee and one Employer Trustee. A-138. That requirement was satisfied by the filing of this lawsuit by the Chairperson of the Fund and the Secretary of the Fund—the first an Association Trustee and the second an Employer Trustee. Nyack has not demonstrated why the Trustees, as a group, should be held to any higher standard. Under the Trust Agreement,

Moreover, as in *Central States*, the auditing power claimed by the Fund is consistent with the goal upon which the Fund rested its audit. *Central States*, 472 U.S. at 571 n.12. The Fund's goal was to monitor the employers' reporting of their contributions and to determine who was entitled to benefits in order to protect the Fund's financial integrity and to ensure that all persons eligible for Fund benefits were informed by the Trustees of their rights. Those objectives were consonant with the auditing power claimed by the Fund.[6]

## 2. Whether the Contractually Authorized Audit Would Have Violated the Fund's Fiduciary Duties

The question then is whether Nyack offered evidence that the Trustees of the Fund, in seeking an audit of the scope set out in the September 9, 2016 Request, violated their fiduciary duties under ERISA. *Central States* instructs that if they did, then the

---

decisions relating to the Trust must be made by a majority vote of the Trustees. Among the Trustees' powers are "to institute, prosecute or defend . . . legal proceedings . . . on such terms and conditions as the Trustees may deem advisable." A-113. The initiation of the litigation based upon the Trustees' interpretation of the scope of the audit authority suffices to show the Trustees' intent, without a formal resolution on the part of the Trustees affirming their interpretation.

[6] The dissent agrees that the language of the Trust Agreement "does not expressly limit the scope of the Fund's audit authority to some predetermined 'subset of the payroll and wage records,'" but it suggests nonetheless that the district court had discretion to limit the scope of the audit in "the absence of any specific description of the audit that the Trust Agreement authorizes," Dissenting Op. at 6, and because the Trust Agreement is missing "an explicit commitment," *id.* at 19. We are aware of no case law that would import a "clear statement" principle into the law of contracts. Rather, the Court's responsibility is to "construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'" *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 102 (2013) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)). Unlike the dissent, while we believe that the request here was reasonable for reasons stated in the text, we also read the Trust Agreement to leave it to the discretion of the Fund directors in the exercise of their fiduciary duties and the auditors acting in conformance with their directions to determine the records it needs to conduct a proper audit rather than to have to justify to a district court on a case-by-case basis that such request is reasonable.

audit may not proceed.  *See Central States*, 472 U.S. at 568.  Pursuant to their fiduciary duties, ERISA provides that trustees must act "solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan."  29 U.S.C. § 1104(a)(1)(D).  Further, ERISA requires trustees to "assur[e] the financial integrity of a plan," *N.Y. State Teamsters Conf. Pension & Ret. Fund v. Boening Bros., Inc.*, 891 F. Supp. 81, 85 (N.D.N.Y. 1995), and to "fully inform[] plan participants of their rights and status under a plan," *id.*  An audit request would be "illegitimate under the [fiduciary duty] of loyalty if it were actually an effort by plan trustees to expand plan coverage beyond the class defined in the plans' terms or to acquire information about the employers to advance union goals" or if the audit is "clearly wasteful of plan assets or unrelated to legitimate plan concerns."  *Central States*, 472 U.S. at 571 n.12.  Therefore, a court need only determine whether the records are sought for an improper purpose or there is clear evidence of waste.  Nyack argues that the Fund bears the burden of proving that the audit's scope is limited to "prudent actions furthering the legitimate purposes of the plan."  *Central States*, 472 U.S. at 582.  But Nyack has the burden of proof backwards.  *Central States* demonstrates that it is Nyack's duty—if it wanted relief from its contractual obligations—to demonstrate that the request, if honored, would result in a breach of duty by the Fund Trustees; it does not charge the district court with the responsibility of determining—on some other indeterminate basis—the advisability of each and every request.  *See id*. at 571 n.12 (noting that "Central Transport, however, has submitted no evidence that Central States' audit program's actual goal was" a violation of the trustee's fiduciary duties).  If an audit request "reach[es] beyond what is appropriate for the proper administration of the plan[]," *Central States* provides that "a court ordering an employer to comply with a particular audit demand could, *upon a proper showing by the employer*, limit the auditors accordingly."  *Id*. at 582 n.23 (emphasis added).

21

Nyack relies upon this Court's decision in *N.Y. State Teamsters Conf. Pension &*
*Ret. Fund v. Boening Brothers*, 92 F.3d 127 (2d Cir. 1996), to further argue that the
Trustees bear the burden of proving that they need the requested records and that the
request for them would be reasonable and not in violation of their fiduciary duties. But
that misreads *Boening Brothers*. *Boening Brothers* addressed the common law rights of
fund trustees to conduct an audit. *See* 92 F.3d at 132. Unlike in this case, the trustees in
*Boening Brothers* had not agreed in advance with the employer regarding the scope of an
audit that the trustees would be permitted to conduct or indeed whether they could
conduct an audit at all. The question thus was whether, in the absence of any
contractual agreement, the trustees nonetheless were permitted to conduct an audit.
This Court, relying upon the common law of trusts, answered that question in the
affirmative. *See id.* at 131–32 ("[F]iduciary duties [under ERISA] draw much of their
content from the common law of trusts, the law that governed most benefit plans before
ERISA's enactment." (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996))). In that
context, where the trustee relied upon its inherent power under ERISA in order to make
an audit, the *Boening Brothers* court held that the fund had the right to perform an audit
only to the extent that the audit was "necessary or appropriate to carry out the purposes
of the trust and [was] not forbidden by the terms of the trust." *Id.* at 132 (quoting
Restatement (Second) of Trusts § 186(b) (1959)). In other words, *Boening Brothers*
establishes that, even in the absence of a contractual provision, a plan trustee has
inherent rights under ERISA, derived from the common law of trusts, to conduct an
audit in order to protect the interests of the plan. *Boening Brothers* establishes a floor for
a trustee's audit authority, not a ceiling that applies even when the parties have agreed
to the trustees' audit authority in a CBA or a trust agreement.

In *Boening Brothers*, we expressly distinguished cases where the trustees have not
defined their required audit in advance from cases like this one, in which the employer

22

contractually committed to submit to an audit. *Id.* at 132. We thus recognized the important differences between a common law right and a contractual right. When a plan asks a court to recognize that it possesses powers with respect to an employer to which the employer has not agreed in advance, it follows that the plan must justify the scope of the request to the court and that the court should make an independent determination that the audit is no broader in scope than necessary to achieve the audit's objective. *Id*. at 134. In such circumstances, the parties effectively place the court in a position where it must make that decision. By contrast, where the parties have agreed in advance to the scope of the audit, it does not fall to the court to second-guess that agreement. The court's role is to apply the familiar law of fiduciary duty and determine whether the party resisting its contractual obligations has demonstrated that satisfaction of those obligations would result in a breach of duty by the trustees.

In this case, however, the district court held that the Fund was not entitled to the payroll and wage records it requested because "the Fund ha[d] not presented evidence that its proposed audit of all of Nyack's employees, as opposed to just Nyack's registered nurses, would further its two alleged purposes." *N.Y. State Nurses Ass'n Benefits Fund*, 2019 WL 4735355, at *6. Under the *Central States* framework, the Fund did not need to present such evidence. Rather, Nyack had the burden of proving that the requested audit would be a breach of the Fund Trustee's fiduciary duties, and Nyack did not meet that burden.

The purpose of the audit was to determine whether Nyack's reports were accurate. In order to do that, the auditors needed more information than simply the list of employees that Nyack had provided as covered by the CBA. Otherwise, the audit would have been pointlessly circular. As the auditor testified at his deposition, he required payroll records beyond those which Nyack self-reported to make sure that everyone who should have been categorized as an RN was so categorized. If there were

23

employees who appeared to be potentially miscategorized based on their wages or other factors, the auditor could then inquire with either NYSNA or Nyack to determine the employees' true category. The duty of loyalty did not foreclose the Trustees or the auditors acting on their behalf from making those inquiries. The duty of loyalty would prevent the auditors from seeking records "unrelated to legitimate plan concerns." *Central States*, 472 U.S. at 571 n.12. But verifying the accuracy of Nyack's reports and discovering potential unfunded liabilities were legitimate Fund concerns that required the auditors to review the payroll records of all Nyack employees.[7]

Nor does the fiduciary duty of care under ERISA require the Trustees to look only to what the employer represents as "the payroll records of all registered nurses" to identify additional plan participants. *N.Y. State Nurses Ass'n Benefits Fund*, 2019 WL 4735355, at *6. The entire point of the audit was to see if there might be additional RNs whom Nyack was *not* reporting. There is nothing in the duty of care that would prohibit the Fund from looking beyond those records and not just relying on the

---

[7] Nyack argues that the Fund here is claiming such unfettered access to hospital records that its auditors could, for example, obtain the full payroll file for its CEO. Of course, an auditor's need to verify the accuracy of an employer's reports would not necessarily require the employer to give the auditor unchecked access to all of its records. The Court need not address the hypothetical situation of whether a more intrusive request for documents along such lines would, in fact, be unrelated to the Fund's legitimate concerns and thus constitute a violation of fiduciary duties such that a court could "limit the auditors accordingly." *Central States*, 472 U.S. at 582 & n.23. The auditors have explained that they adopted a methodology of reviewing the overall payroll registers for Nyack, as well as a sampling of more detailed records; identifying employees who are receiving pay that could be consistent with the jobs classified for RNs under the CBA; and then, if such employees are identified, asking for more detailed records about those particular employees to determine whether they are in fact covered by the CBA and eligible for the Fund. Nyack adduced no evidence that the Fund had made such an extreme request, and, at oral argument, the Fund made clear that, unless Nyack happens to pay its CEO about the same as one of its RNs, the methodology advanced by the auditors would not appear to sweep in such a request.

employer's say-so, as Nyack has not put forth any evidence that a broader audit will injure the Fund's participants. In the absence of clear evidence of a waste of Fund assets, there is nothing in ERISA that would prevent the Trustees from also looking at "the payroll records of non-registered nurses" (as reported by Nyack) to determine whether employees were misclassified and thus to identify potential additional Fund participants. *Id.*

There is also no merit to Nyack's argument that the Fund has no legitimate interest in the requested payroll records of persons whom Nyack has not identified as RNs because—as a result of Nyack's failure to identify them as RNs—the Fund will incur no liabilities with respect to those persons. That argument fails for three reasons. First, it rests on a misunderstanding of the Trustees' obligations and rights and of Nyack's responsibilities under the Trust Agreement and CBA. The Trustees' interest in financial integrity is not limited to those RNs who choose for any particular year to enroll in the Fund. It also extends to those RNs who are eligible to, but do not, participate in the Fund in the current year but who may choose to enroll in future years (perhaps when their health situation worsens), thereby giving the Fund a current interest in the financial integrity of those RNs. Second, the Fund depends on receiving contributions on behalf of those whom neither the Fund nor the employer have currently identified as beneficiaries but who might claim to be beneficiaries at some later date. Third, the Fund has obligations under ERISA to notify participants of their rights under the Plan.

In the district court, Nyack made two additional arguments for why the contractually permitted audit was a breach of the Trustee's fiduciary duties, both of which are foreclosed by governing law. First, Nyack argued that the Fund need not conduct an audit to determine whether Nyack correctly reported all of the employees who are eligible for participation in the Fund or for whom Nyack must make

contributions because the Fund is, in effect, self-policing. Nyack further argued that, even if it were to mislead the Fund about the membership of the bargaining unit, the Fund could rely on NYSNA to keep it informed as to whom it represents. Moreover, according to Nyack, "an eligible employee omitted from the Fund's health plan here would feel the effect immediately (loss of coverage or of the incentive payment for opting out), with plenty of motivation to complain through the union (to obtain coverage or of the incentive payment), and no long-term liability would accrue to the Fund because an eligible employee who is not enrolled cannot receive benefits." Nyack's Br. at 23.

There are several flaws in this argument. First, the Trustees have *independent* fiduciary duties under ERISA to ensure Fund integrity and to inform beneficiaries of their rights under the Fund. *See, e.g., NLRB v. Amax Coal Co.*, 453 U.S. 322, 333 (1981) ("ERISA vests the 'exclusive authority and discretion to manage and control the assets of the plan' in the trustees alone, and not the employer or the union." (quoting 29 U.S.C § 1103(a))). Those duties cannot be discharged simply by saying that the employees would know themselves when they got sick and required benefits; instead, ERISA trustees have an affirmative fiduciary obligation "to 'provide employees with a comprehensive explanation of the contents of the plan.'" *Electro-Mech. Corp. v. Ogan*, 9 F.3d 445, 451 (6th Cir. 1993) (quoting *Allen v. Atl. Richfield Ret. Plan*, 480 F. Supp. 848, 851 (E.D. Pa. 1979), *aff'd*, 633 F.2d 209 (3d Cir. 1980)). Trustees are not required to, and indeed might not always be permitted to, rely on third parties with different interests to discharge those duties. Judge Kravitch, writing for the Eleventh Circuit in *Vertex Construction*, persuasively analyzed and disposed of the argument that the Trustees should be required to rely on the union. The "trust funds are independent of the employers that contribute to them and the union employees who benefit from them." *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Constr. Co.*, 932 F.2d 1443,

26

1451 (11th Cir. 1991). The court further added that the union had different interests from that of the plan trustee: the union's duty is "to act in the group's interests regarding the overall terms and conditions of employment" whereas the "trustees' duty . . . is to provide specific benefits to those who are entitled to them in accordance with the terms of the plan." *Id.* (quoting *Central States*, 472 U.S. at 576–77). The union itself might misclassify employees or might not know each and every employee whom it represents. To force the plan trustees to rely on the union representatives to discharge the trustees' duties to ensure plan integrity and the plan participants' rights to know of the benefits to which they may be entitled would impermissibly empower "employers and unions to bargain away the rights and powers of fund trustees in agreements to which the trustees were not a party," ultimately "result[ing] in underfunded plans that could not pay appropriate benefits to their beneficiaries." *Id.*

Second, Nyack's argument that the Trustees should not be permitted to conduct the audit set forth in the September 9, 2016 Request because they can rely on NYSNA and the beneficiaries is squarely foreclosed by *Central States*. In *Central States*, the employer argued that employees could rely upon the union, rather than the fund trustees, to ensure enforcement of an employer's collectively bargained obligations. 472 U.S. at 575. The Court rejected that argument, holding that the union and the fund had separate obligations. The union was obligated to act on behalf of bargaining unit workers as a group. By contrast, the fund had a fiduciary duty to "provide specific benefits to those who are entitled to them in accordance with the terms of a plan." *Id*. at 577. The Court concluded that requiring the trustees to rely upon the union "would erode the protections ERISA assures to beneficiaries, for the diminishment of trustee responsibility that would result would not necessarily be made up for by the union." *Id*. at 575; *see also Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364 (1984) (holding

27

that federal policy does not favor a union's grievance and arbitration system for a trustee's enforcement of an employer's trust obligations).

Third, as demonstrated above, under *Central States*, once a fund has shown that an audit is within the scope of that agreed to by the employer and the requested documents are among those permitted by the trust agreement to which the employer is bound, it is not for the employer to determine whether there are alternative means by which the trustees can satisfy their fiduciary duties. The trustees themselves can determine how best to satisfy those duties.

Nyack's second argument in the district court was that it should not be ordered to produce the requested information because the Trustees would illegitimately use the information to expand the coverage of the Fund. Nyack suggested that the Trustees would "second-guess the inclusion of employees within the bargaining unit of another union," and "challenge[] the jurisdictional boundaries between the four unions in the Hospital workplace." Nyack's Br. at 30–31.[8]

Three facts undermine Nyack's position. First, as the Supreme Court noted in *Central States*, the district court may impose confidentiality protections on the enforcement of a contractually authorized audit in order to protect against misuse of the employer's records. 472 U.S. at 582 n.23 (citing with approval a district court decision to order an employer to comply with an audit request that "allow[ed] the employer to restrict the auditors' ability to copy or disclose information where the auditors' [sic] did not need to do so."). Here, there is no evidence that the auditor's offer to provide a

---

[8] As NYSNA argues in its reply, this argument is based in part on a mischaracterization of Rosetti's affidavit. Rosetti stated that the purpose of the audit was to "identify employees who were not *reported* by Nyack but are covered by the CBA." NYSNA's Reply Br. at 28 (emphasis in original).

28

confidentiality agreement would have included a provision to allow disclosure to NYSNA.

Second, although *Central States* does hold that a court may find the scope of a contractually permissible audit unlawful if the audited party can show that the scope of the audit would constitute a breach of fiduciary duties, Nyack has not put forth evidence suggesting that the Fund's audit efforts constitute such a breach. Instead, Nyack argues that the very fact that NYSNA has asked for an audit of the payroll registers of all employees, plus more detailed payroll records for employee samples, suffices to show an illegitimate purpose. But this circular argument cannot succeed. The bare fact that a contractually permitted audit is broader than the audited party believes it needs to be does not adequately show that the audit has an impermissible purpose. Nyack must make an affirmative showing that the scope of the audit request constituted a breach of the Fund Trustee's fiduciary duties, and it has not done so.

Third, as a matter of law, the fact that benefits are mistakenly paid by an employer to one union benefit fund is not necessarily a defense to a claim that they were actually owed to a different benefit fund. Thus, to the extent that Nyack relies on the claim that the Fund will use the audit to obtain contributions for employees to which it is not entitled, the mirage is a figment of Nyack's imagination, not supported by any evidence. Not only was there no evidence offered in the district court of any improper communication between the Fund and NYSNA, and not only would Nyack have the interest and ability to resist any such impermissible demand, but the other unions themselves would have the ability and the interest to prevent the Fund from using the audit to obtain contributions to which the Fund was not entitled. The argument on which Nyack relies could be levelled in any case where the employers' workforce is represented by more than one union. In the absence of evidence, it cannot suffice to limit the audit rights of the trustees of a benefit fund.

Nyack's arguments would require the district court to act, in effect, as super-auditor, questioning the decision of the Trustees and the independent certified public accountant as to each category of records requested by the Fund and its auditors and determining whether those particular records are strictly necessary for the audit. It may be that a different auditor conducting a payroll audit might determine that some of what the auditor has requested here is not necessary. However, the teaching of *Central States* is that, once the trustees and the employer have agreed in advance to the scope of an audit the trustees are authorized to conduct, it is not generally for either the employer or the district court to draw such lines and to determine which payroll records beyond those of covered employees are truly necessary for the audit. We hold that, in the absence of evidence presented by an employer of a breach of the duty of loyalty or the duty of care, benefits plans like the Fund are entitled to require participating employers to submit to contractually permitted audits. The district court did not identify any evidence that would create a genuine issue of fact either that the audit request constituted "an effort by plan trustees to expand plan coverage beyond the class defined in the plans' terms or to acquire information about the employers to advance union goals" or that the audit itself was "clearly wasteful of plan assets or unrelated to legitimate plan concerns." *Central States*, 472 U.S. at 571 n.12. Therefore, Nyack did not meet its burden of proving that the requested audit would be a violation of the Fund Trustees' fiduciary duties. Absent such a showing, the Fund is entitled to conduct the audit as requested in the September 9, 2016 Request.[9]

Nyack's legitimate interest in this case, which is preserved by the Trust Agreement and the law, is that its confidential information not be publicly disclosed or

---

[9] NYSNA has moved to strike an argument made by the Hospital in its reply brief concerning the "in connection with" language of the Trust Agreement. The argument that NYSNA seeks to strike is immaterial to our decision in this case. The motion is denied.

used for an improper purpose. That issue will remain in this case. The Fund's auditors offered to sign a confidentiality agreement. The district court did not consider whether that agreement was necessary or sufficient to protect against misuse of information because of its erroneous ruling as to the scope of the documents Nyack was required to provide. Upon remand, before entering a final judgment consistent with our opinion, the district court will have an opportunity to exercise its considerable discretion to determine whether and how to issue an appropriate confidentiality order.

## CONCLUSION

In summary, we hold that in the absence of evidence presented by an employer of a breach of the duty of loyalty or the duty of care, benefits plans like the Fund governed by ERISA are entitled to require participating employers to submit to contractually permitted audits.

Here, we hold that the Fund was contractually authorized to conduct an audit of the payroll records of Nyack employees as requested on September 9, 2016, and that there was no evidence that its request constituted a violation of the Fund Trustee's fiduciary duties. Accordingly, the audit should have been permitted to proceed.

For the foregoing reasons, we (1) affirm the district court's decision to the extent it granted the Fund's motion for summary judgment and denied Nyack's cross-motion for summary judgment; and (2) reverse the district court's decision to the extent it denied summary judgment to the Fund and granted Nyack's cross-motion for summary judgment. We vacate the district court's decision and remand for the district court to enter a final judgment consistent with this holding. Additionally, on remand, the district court may consider whether and how to exercise its discretion to enter an appropriate confidentiality order.

31

CARNEY, *Circuit Judge*, dissenting in part:

As its name—New York State Nurses Association ("NYSNA")—tells us, NYSNA represents nurses in the State of New York. In 2015, under its collective bargaining agreement ("CBA") with Nyack Hospital (the "Hospital"), it represented 485 registered professional nurses employed full-time, part-time, or per diem by the Hospital. That cohort amounted to a little over one-third of the Hospital's 1,393 employees.

In 2016, NYSNA's affiliated benefits fund (the "Fund") demanded an audit of the Hospital's 2015 payroll records for all Hospital employees, including the 900 or so who were not registered nurses and whom NYSNA did not represent. Of those individuals, approximately 700 were members of other unions, including locals of the Service Employees International Union, the Communications Workers of America, and the International Union of Operating Engineers. The demand for records covered those such as the Hospital's executive team and its engineering staff, who were not even arguably covered by the CBA, nor remotely eligible to participate in the benefits plan (the "Plan") operated by the Fund under the Employee Retirement Income Security Act ("ERISA").

The Fund asserted that it sought only to identify all Hospital employees entitled to participate in the Plan and to ensure that the Hospital had made the required contributions on their behalf. As authorization for its workforce-wide demand, it pointed first to the language of the Fund's applicable multiemployer Agreement and Declaration of Trust:[1] "The Trustees may, at such times and places as may be appropriate, have an audit made by independent certified public accountants of the

---

[1] This document is formally entitled the Second Amended and Restated Agreement and Declaration of Trust Establishing the New York State Nurses Association Benefits Fund. For convenience, I refer to it as the "Trust Agreement."

payroll and wage records of any Employer in connection with the said Employer Contributions, Employee Contributions, and/or reports." J. App'x 122. It also relied on the Fund Trustees' stated authority to interpret that document, so long as they did so in good faith.

The Hospital offered to make available the payroll and wage records of those of its employees who were registered nurses and who had also enrolled in the Plan. The Fund rejected the offer and then sued, seeking a district court "[o]rder to compel the production of all books and records necessary to perform an audit examination pursuant to the Trust Agreement and ERISA," J. App'x 29, and maintaining that the "necessary" records were those of all Hospital employees notwithstanding the limits of the CBA.

The district court, after receiving evidence and hearing argument from the parties, entered summary judgment in part for NYSNA and in part for the Hospital, ordering the Hospital to produce payroll and wage records of all of its registered nurses, whether or not they were enrolled in the Plan. (Some eligible registered nurses had opted not to enroll.) *See N.Y. State Nurses Ass'n Benefits Fund v. Nyack Hosp.*, No. 17-cv-1899, 2019 WL 4735355, at *6 (S.D.N.Y. Sept. 27, 2019). Looking to the terms of the Trust Agreement and the CBA, the district court rejected the proposition that the Hospital had agreed to provide the Fund with carte blanche access to payroll and wage records for its entire workforce. It rebuffed the argument that the Supreme Court's 1985 decision in *Central States See Central States, Se. & Sw. Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, required entry of the Fund's proposed order. It further explained that it would not enter the workforce-wide order because it had before it "no evidence" that the Fund's audit of payroll records "of all of Nyack's employees" would "lead to the discovery of unfunded liabilities" or "allow the Fund to identify additional plan participants," the two purposes that the Fund claimed the sweeping audit would

2

serve. *Id.* No additional payroll and wage records would be necessary, reasoned the district court, because "[o]nly registered nurses . . . are permitted to join the plan, and Nyack is only responsible for contributing to the Fund on behalf of covered employees (who must be registered nurses)." *Id.*

Both the Fund and the Hospital appealed.

I join the Majority in concluding that the district court correctly denied the Hospital's motion to limit the audit to records of NYSNA members who had enrolled in the Plan. Unlike the Majority, however, I would rule that the district court did not abuse its discretion or otherwise err when it entered an order restricting the audit to review of the records of the registered professional nurses employed by the Hospital. Properly understood, the Trust Agreement does not commit the Hospital to producing the records of its entire workforce, and the district court had discretion to exclude the records of those who are not registered nurses, in light of the terms of the Trust Agreement and CBA, the holding of *Central States*, and the want of evidence showing that examination of those additional records would actually be "in connection with" the relevant contributions and related reports in any meaningful way. I therefore respectfully dissent from that portion of the Majority's decision that reverses the district court's order with regard to these records.

## DISCUSSION

The Majority concludes that the language of the Trust Agreement and the Supreme Court's decision in *Central States* foreclose the district court's decision to limit the scope of its production order. In my view, it errs on both counts. The district court properly interpreted the Trust Agreement, reading it in tandem with the CBA and correctly understanding it through the lens of *Central States*, and the court committed no

3

clear error in its analysis of the record. It was accordingly entitled to shape its order as it did, in its discretion. I would affirm its order in full.

**I.      The Trust Agreement obligates the Hospital to produce wage and payroll records "in connection with" its obligations to "Employees" as an "Employer"**

Through an Acknowledgment of the Trust Agreement that it executed and adopted in a renewed CBA it signed with NYSNA in 2014, the Hospital agreed that it would participate in the Fund, a preexisting multiemployer trust that administered the Plan under the Trust Agreement. In the Trust Agreement, the Hospital agreed to contribute regularly to the Fund with respect to those of its employees who are "covered by a collective bargaining agreement between [the] Employer and the Association [i.e., NYSNA]," subject only to certain marginal exclusions. J. App'x 102 (Tr. Agt. art. I, para. 2). As to audits, article V of the Trust Agreement provided:

> The Trustees may, at such times and places as may be appropriate, have an audit made by independent certified public accountants of the payroll and wage records of any Employer in connection with the said Employer Contributions, Employee Contributions, and/or reports.

*Id.* at 122 (Tr. Agt. art. V, para. 5). It defined "employee" with reference to the CBA: "The term 'Employees' . . . shall mean all persons covered by a collective bargaining agreement between an Employer and [NYSNA]." *Id.* at 102 (Tr. Agt. art. I, para. 2).

The CBA between NYSNA and the Hospital states in relevant part that it covers "all full-time, regular part-time and per diem registered professional nurses employed by the Hospital, including every person lawfully authorized by permit to practice as a registered professional nurse and every person employed in a position which requires a

4

registered professional nurse." [2] *Id.* at 150 (CBA para. 1). Thus, unlike some plans and CBAs, the universe of covered persons is defined by an objective, readily ascertainable standard related to status, not function.

The Trust Agreement's audit clause obligates the Hospital, as the employer, to allow the Fund to audit "the payroll and wage records . . . in connection with the said Employer Contributions, Employee Contributions, and/or reports." *Id.* at 122 (Tr. Agt. art. V, para. 5). It does not use the word "all" or otherwise unmistakably indicate a comprehensive workforce-wide obligation. Rather, it refers to "the" records and identifies those records that are maintained "in connection with the said Employer Contributions, Employee Contributions, and reports." Its plain language thus does not demand the broad and inflexible reading adopted by the Majority.

The phrase "the payroll and wage records" must be read, moreover, in tandem with the CBA, as referencing those employees who are covered by the CBA, according to the CBA's definition of "employees." In other words, any audit of payroll and wage records *not* related to such employees would generally not be "in connection with the said Employer Contributions[] [and] Employee Contributions," except in some hypothetical tangential sense. It is hard to imagine how an audit of the payroll records of the Hospital's engineers or chief executive, for example, could be said to be "in

---

[2] The CBA further provides expressly that it does *not* include persons occupying a long and detailed list of positions in which registered nurses might be found: "assistant administrator, director, associate directors, assistant directors, staff education instructors, utilization review nurses, patient education coordinator, patient education instructors for Lamaze, patient education instructors for obstetrical programs, clinical specialists, obstetrics supervisors, central service supervisors, operating room supervisors, critical care supervisors, assistant critical care supervisors, head nurses, home care coordinators, assistant home care coordinators, evening night and weekend supervisors, assistant supervisors, relief supervisors, case managers, assistant head nurse managers, nursing coordinator of patient services, all other supervisory, managerial and administrative employees and all other employees employed by the Hospital." J. App'x 150.

connection with" the Hospital's contribution obligations for registered nurses under the Trust Agreement as read in the context of the CBA.

Yet the Majority reads the audit clause to require the Hospital to produce *all* of its payroll and wage records on demand, treating them all as "in connection with" the Hospital's and CBA employees' contribution duty to the Fund. It reasons that the limiting clause "in connection with" concerns only the general "objective of the audit," Maj. Op. at 16—and it is apparently willing to accept a relaxed and expansive conception of that objective, notwithstanding any countervailing interest that the employer (and other potentially related unions and benefit plans) might reasonably hold. It further reads the article "the" (as in "the payroll and wage records") as equivalent to "all," and argues that this reading is what the parties bargained for when the Hospital signed on to the Trust Agreement. Because this is—in the Majority's view—the plain meaning of the Trust Agreement, it concludes that the district court erred by failing to order an audit of the payroll and wage records of the Hospital's entire workforce.

The text does not compel this maximalist position. I agree that a requirement that an audit request be consistent with the audit's general purpose can be understood as implicit in the clause's language. And, true, the language does not expressly limit the scope of the Fund's audit authority to some predetermined "subset of the payroll and wage records." *Id*. But neither of these observations overcomes the ambiguity created by the absence of any specific description of the audit that the Trust Agreement authorizes. In the context of a multiemployer-supported Fund and a general Trust Agreement read in conjunction with a certain employer's CBA, the Majority's interpretation strikes me as implausible: it reads into this unspecific language a bargained-for agreement by two private parties for one to open all of its payroll and wage records to the other without any facial connectedness to the obligations of either.

6

As to whether the definite article might "suggest[] specificity," *id.* at 17 (quoting *Noel Canning v. NLRB*, 705 F.3d 490, 500 (D.C. Cir. 2013)), we have to ask what level of specificity it suggests. Does the mere use of the word "the" in this context really tell us the answer to the question, "*Which* payroll and wage records?" The Majority, by excising the operative phrase from its context, responds, "*All* payroll and wage records." Viewing the phrase in the context of an audit conducted "in connection with the said Employer Contributions, Employee Contributions, and/or reports," and with consideration for the reasonable expectations of the parties, as discussed further below, the phrase refers only to such records as are reasonably related to accomplishing the authorized purposes of the audit, in connection with the related CBA. The CBA then provides the audit's reasonable boundaries: the predetermined subset of the payroll and wage records, related to the covered employees alone: a readily ascertainable subset of the whole workforce.[3]

In an alternative approach, the Majority points to the Trust Agreement's article IV, section 2 as supporting its position that the district court erred by scrutinizing and rejecting the Fund's assertions about the breadth of the Hospital's audit obligation. That section, entitled "Construction of Agreement," provides:

---

[3] The Majority suggests further that the parties negotiated for the result that the Majority advocates: that the Fund and the Hospital worked out the terms of the relationship and that the district court was wrong to interfere in the agreement that the parties struck. *See* Maj. Op. at 16–18. But the Hospital did not negotiate the Trust Agreement: that multiemployer agreement was negotiated by others before the Hospital agreed to participate in the Plan. Rather, the Hospital negotiated the CBA with NYSNA and accepted the audit provision in the Trust Agreement through its Acknowledgment, which was adopted together with the operative CBA. It was the CBA that defined the scope of the parties' relationship and the "Employees" subject to the Trust Agreement. The parties identify no basis in the text of the Trust Agreement or in the record for concluding that the Hospital should have expected the Trust Agreement's audit provision to reach beyond those employees arguably covered by the CBA. Certainly, the use of the word "the" before "wage and payroll records" in article V gave no such warning.

> The Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein and any construction adopted by the Trustees in good faith shall be binding upon the Association, the Employer, and the Employees and their families and dependents.

J. App'x 113.

I struggle to understand how, in the context presented, this provision shuts the door on the Hospital's and district court's reading of the Trust Agreement in the context of the CBA. The Fund is urging an unreasonably and unsupported interpretation of the phrase "the payroll and wage records . . . in connection with the said Employer contributions." The reading is not compelled by the Trust Agreement, it is undercut by the CBA, and at the end of the day, it is simply not tenable. Moreover, the trustees do not have equivalent interpretative authority with regard to the CBA, and the CBA's terms—including those defining which employees are covered by the CBA—are critical to the meaning and application of this clause of the Trust Agreement. Reading the documents together leaves no ambiguity that is sufficient to empower the Fund's trustees to impose the advocated construction. The "Construction of Agreement" provision thus does not in my view convert the district court's construction into an error of law or otherwise infect its decision to order a more tailored audit than the Fund requested. And the Hospital does not need to make a showing of any bad faith on the part of the trustees to sustain this proposition.

Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance," including with regard to "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002). Pursuant to this principle, courts charged with enforcing New York contracts properly do so within the bounds of the reasonable expectations of the parties, insofar

8

as such expectations are consistent "with other terms of the contractual relationship." *Id.*; *see also Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989) ("The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract."). Here, in the absence of contractual language to the contrary in the Trust Agreement and in light of the terms of the CBA, the district court did not err when it declined to enter the Fund's requested audit order after concluding that the Hospital had not expected that it would be required to disclose to the Fund hundreds of employee records that were not shown to be necessary, relevant to, or otherwise "in connection with" the Employer's obligations under the Trust Agreement and CBA.

## II.   *Central States* does not require reversal of the district court's order

The Majority reads *Central States* to prevent this district court from limiting the scope of the demanded audit absent proof by the Hospital that in conducting the audit, the Fund trustees would violate their fiduciary duty. I believe this view overreads *Central States*.

The *Central States* case came to the Supreme Court after the Sixth Circuit held that, to audit employer records concerning non-union employees, the plaintiff benefit funds needed to show "reasonable cause to believe that a particular person is covered by a collective bargaining agreement" and was misclassified as not covered. *See Central States, Se. & Sw. Areas Pension Fund v. Central Transport, Inc.*, 698 F.2d 802, 811 (6th Cir. 1983), *rev'd*, 472 U.S. 559 (1985). The Supreme Court held that, when the audit is authorized by contract, the law requires no such particularized reasonable-cause showing as a predicate for a court order directing an audit of non-union employee records. *See Central States*, 472 U.S. at 568–69. The Court's holding was thus in important respects limited. It wrote, "[T]here is no reason in ERISA or the plan documents of this

9

case why the kind of audit requested here should, *as a matter of law*, be considered outside the scope of proper plan administration." *Central States*, 472 U.S. at 582 (emphasis added).

The *Central States* Court, unsurprisingly, left no doubt that an audit demanded by a fund "would be illegitimate" if shown by the employer to violate the fund trustees' fiduciary duties. *Id.* at 571 n.12. And, although the statement was not necessary to its holding, the proposition is easy to accept. Yet it did not instruct, as the Majority now seems to suggest, that i*n the absence* of a demonstrated violation of fiduciary duties by the requesting party, a district court lacks discretion to limit the scope of the demanded audit.[4] In fact, in its footnote 23, the *Central States* Court acknowledged that a fund's "right to demand access to employer records does not reach beyond what is appropriate for the proper administration of the plans." *Id.* at 582 n.23. The Court concurrently recognized, moreover, that "a court ordering an employer to comply with a particular audit demand could, upon a proper showing by the employer, limit the auditors accordingly." *Id.*

The Court then observed that such court-ordered limitation was not necessary in *Central States* because in that case, unlike here, the fund had already "agreed to various limits on its audit so as not to exceed what would be reasonably appropriate for the service of the audit's legitimate purposes." *Id. Central States* thus suggests that a court

---

[4] In footnote 12 of the *Central States* opinion, on which the Majority substantially relies, the Supreme Court stated that the employers' failure to show that "Central States' audit program[]" would violate the fund trustees' fiduciary duties meant that "whether the auditing power claimed by Central States is consistent with ERISA must be analyzed in terms of the goal upon which Central States has rested its audit." 472 U.S. at 571 n.12. The Court's conclusion that the requested audit was "consistent with ERISA" does not entail, however, that a district court is without power to limit the scope of the audit further if circumstances make such limitations appropriate. *Id.*

10

asked to order such an audit pursuant to a trust agreement must first determine whether such an audit is authorized at all by the agreement. The court must next decide whether the requested audit is consistent with the trustees' fiduciary duties under ERISA. Having taken those steps, the court then must determine, in its discretion, whether in the circumstances presented the employer has made a "proper showing" that the court should impose any limitations on the scope of the audit. *Id.*

The Majority implicitly holds that a district court has no such discretion to shape its order. Instead, it suggests that footnote 23 addresses only the burden on the employer to show that a proposed audit violates the fund trustees' fiduciary duties. *See* Maj. Op. at 21. Yet at the same time the Majority reads footnote 23 as generally endorsing the authority of the district court to "impose confidentiality protections on the enforcement of a contractually authorized audit in order to protect against misuse of the employer's records." *Id.* at 28. The parties do not dispute that district courts may impose confidentiality restrictions on proposed audits, and the auditor retained by the Fund offered as much. But the text of that footnote says more: that district courts may restrict the scope of audits for other reasons as well. The *Central States* Court cited with approval an unreported district court decision in which an employer subject to audit had been permitted not only, in the Court's words, to "restrict the auditors' ability to copy or disclose information" but also to "withhold specific information that was not relevant to the audit's purposes." *Central States*, 472 U.S. at 582 n.23 (citing *Central States, Se. and Sw. Areas Pension Fund v. Theut Products*, No. 82-cv-71080 (E.D. Mich., Oct. 21, 1982)). Thus, although an obligation of confidentiality surely is one type of limitation that a district court might impose, I see no reason to read this footnote as endorsing limits on audits *only* insofar as they may advance confidentiality. In my view, where there is ambiguity in the authorizing documents and a record such as that

11

presented here, *Central States* does not constrain the district court from crafting a suitable production order.[5]

## III. This Court owes deference to a district court's tailored order subjecting a party to an audit in the absence of clear contractual language regarding its scope

There is substantial daylight between, on the one hand, a rule allowing a district court discretion to shape its command only upon a finding of trustees' breach of fiduciary duties of loyalty and care, and, on the other, a rule allowing a district court to exercise discretion upon a finding that certain aspects of an audit are neither required by the agreement nor sufficiently supported by a fund's claimed legitimate purposes. Since *Central States*, our Court has recognized that district courts retain discretion to shape otherwise generally proper audits. *See N.Y. State Teamsters Conference Pension & Retirement Fund v. Boening Bros., Inc.*, 92 F.3d 127, 134 (2d Cir. 1996) (holding that proposed audit was proper exercise of fund's common law powers but also instructing district courts that "it may be appropriate for [defendant employers] to seek protection from an audit that is unduly broad or intrusive in its scope"). We have not, however, closely examined the source of that authority.

In my view, a district court's authority to limit its order concerning the scope of an audit that is generally authorized by contract, but whose scope is not clearly specified, is rooted simply in its well-established discretion to shape equitable relief. A district court is entitled to shape that relief, even in the absence of a proven fiduciary-duty violation, when it reasonably determines based on the record before it that the full audit requested would not advance the trustees' asserted legitimate purposes.

---

[5] I note too that generally under New York law, the initial interpretation of a contract's terms—including whether those terms are ambiguous—is a matter of law for the court to decide. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998).

I would conclude, therefore, that the district court in this case reasonably exercised its equitable discretion by limiting the Fund's audit of payroll records to those in connection with registered nurses both in and outside of the bargaining unit. The order's equitable nature carries with it substantial latitude for a district court to define the precise contours of the actions it directs. The Restatement (Second) of Contracts explains that "[a]n order of specific performance or an injunction will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice requires." Restatement (Second) of Contracts § 358(1) (1981). The order "need not be absolute in form," and the specific performance ordered "need not be identical with that due under the contract." *Id.* The reporters comment further:

> The objective of the court in granting equitable relief is to do complete justice to the extent that this is feasible. . . . [T]he court has the power to mold its order to this end. The form and terms of the order are to a considerable extent within the discretion of the court.

*Id.* cmt. a.[6]

Consistent with these principles, this Court should review with deference a district court's order limiting the scope of an audit that it is compelling a party to undergo. *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016) ("It is axiomatic that the contours of an injunction are shaped by the sound discretion of the trial judge and, barring an abuse of that discretion, they will not be altered on appeal." (internal quotation marks omitted)); *United States v. Bedford*

---

[6] This principle holds when, as here, trustees seek specific performance of a contract. *See* Amy Morris Hess et al., Bogert's The Law of Trusts and Trustees § 717 (2021) ("Courts of equity exercise their discretion in granting specific performance of a contract made by a trustee, as they do with other contracts.").

*Assocs.*, 657 F.2d 1300, 1314 (2d Cir. 1981) ("Specific performance is an equitable remedy, committed to the district court's sound discretion.").

**IV.    The district court tailored its order in a reasonable exercise of its discretion**

In the legal and factual setting presented, I would conclude that the district court acted within the permissible scope of its discretion when it limited the Fund's audit of the Hospital's payroll records to those of its registered nurses. As discussed above, I do not accept that the Trust Agreement or *Central States* compelled an all-employee audit. Further, the Hospital argued convincingly that, as a matter of fact, to serve the legitimate purposes of such an audit—confirming that the Hospital had made the required contributions and had not, purposely or otherwise, misidentified registered nurses for whom contributions were owed—the Fund did not need to review payroll and wage records of individual employees other than registered nurses. Fund had an opportunity to counter the Hospital's position but failed to do so, leading the district court to conclude that the record contained "no evidence that an audit of all of Nyack's employees' payroll records, as opposed to just registered nurses, would lead to the discovery of unfunded liabilities," and that "[r]egarding the Fund's second alleged purpose [for the audit], there is no evidence the payroll records of non-registered nurses would allow the Fund to identify additional plan participants." *NYSNA Benefits Fund*, 2019 WL 4735355, at *6. I see no basis for ruling that these findings are clearly erroneous.

Excerpts from the record help to explain the district court's ruling by illustrating the Fund's failure to provide a coherent justification for a whole-workforce audit. In a revealing exchange, the auditor retained by the Fund testified as follows regarding the purported need for payroll records relating to all employees:

A. Because the way this plan is set up, we have to know who is a part-time, who is a full-time and then we also have to delve into the opt-in and opt-out situations.

Q. How does the payroll register tell you anything about opt-in or opt-out?

A. It does not. We would have to look at other client records for that.

Q. . . . The payroll register could tell you whether they're part-time or full-time, right?

A. Yes.

Q. And for that you would just need to see the records of the registered nurses who are participants, right?

A. No, no.

 . . . Q. What other record would tell you whether or not the participant you selected was part-time or full-time?

A. That wouldn't be the instance why we would want to see them all. We would want to see them all to make sure we've covered the whole population, that there isn't [sic] people who should be part of the nurses or categorized in that group that aren't in that group and we wouldn't be able to see that unless we saw the full payroll records.

Q. We will come back to that particular issue in a minute. I want to know for these purposes, for purposes of executing Agreed Upon Procedure 3, where you're looking at a sample of persons who are already identified participants, *how would looking at records other than records for registered nurses be of any assistance.*

Ms. Dell: Objection to form.

A. *It would not.*

J. App'x 344-46 (emphasis added). Another colloquy was similarly unenlightening.[7]

---

[7] The Hospital's counsel also asked the Fund's auditor, "Why does anyone who is not a registered nurse have to be part of your examination?" J. App'x 351-52. The auditor replied,

Notwithstanding these evidentiary weaknesses, the Fund insists that payroll records for all employees will allow its auditors "to identify employees who are covered by the applicable collective bargaining agreement," and then identify any such employees for whom the Hospital did not make contributions by "compar[ing] the payroll register for [a given] month with the employees listed on the employer's

---

"Because we're looking to see if there would be other people on the payroll who might be registered nurses that are misclassified." *Id.* at 352. The auditor's subsequent testimony only adds to the confusion:

> Q. How would you determine that from the payroll?
>
> A. Based on—we would try to compare the hourly rate to people in the bargaining unit.
>
> Q. Why does that tell you anything about whether or not somebody is a registered nurse or just a well-paid mechanic?
>
> A. Then we would ask the question. In other words, when we look at the people, we come up with a thought pattern and then we would question it.
>
> Q. Other than the idea there may be some individuals who are paid the same as a registered nurse, what else would the payroll register reveal to allow you to draw any conclusion about whether or not somebody is misclassified?
>
> A. Can you repeat that question?
>
> Q. Yes. What other information could you derive from the payroll register other than what you just mentioned about the pay rates that would allow you to draw any conclusions about whether or not the person may be misclassified?
>
> A. We could get an idea how organized the payroll records are at the organization. We could get an understanding of the departmentalization of potentially the payroll.
>
> Q. What does that tell you about misclassification?
>
> A. Well, depending how—when we interact with the client, depending on the answers, when we look into it, could tell us these records may be more pristine than a different case.

*Id.* at 352–53.

contribution report for that month." Fund's Br. at 32–33. This assertion has some basic and generic plausibility in many labor contexts, where the members of the collective bargaining unit are not so easily identified as they are here. But, as illustrated, the Fund failed to explain in the district court, and continues to falter in explaining on appeal, why payroll records for all the registered nurses working at the hospital—the full-time, part-time, and per diem registered nurses, whether or not enrolled in the Fund's benefit plan—would not be entirely sufficient for this task.

The Fund's only clear argument now in support of its position that it must review the payroll records of *all* employees to ensure that the Hospital is meeting its obligations is advanced for the first time on appeal. It now claims that, because its CBA with the Hospital also covered "every person employed in a position which requires a registered professional nurse," J. App'x 150, it must review the payroll records of all employees who are not registered nurses (as well as the registered nurses) to see if they may be employed in such a position and are therefore eligible to participate in the Fund. Perhaps anticipating such an argument, the district court made passing mention of this odd category and dismissed it as having any significance, reasoning that it did not expand the cohort of possible Plan coverage: if a position requires the employee to be a registered nurse, a registered nurse must occupy that position. *See NYSNA Benefits Fund*, 2019 WL 4735355, at *6. The Fund's auditors do not appear to have even mentioned this potential category of coverage in testimony discussing the need for a full-workforce audit. The Fund's failure to raise and develop this argument earlier should preclude us from upsetting the district court's order in reliance on it.

Now responding to the argument, the Hospital casts additional, substantive doubt on the Fund's interpretation of this part of the subject clause of the CBA, explaining that its purpose is only "to allow NYSNA to assert the right to have [registered nurses] claim work that has been erroneously assigned to others." Hospital's

17

Br. at 32 n.10. Rather, the Hospital persuasively posits that this provision "does not transform such employees into NYSNA members who may participate in the Fund." *Id.* For all these reasons, this afterthought argument cannot reasonably serve to invalidate the district court's order.

Finally, the Fund has repeatedly claimed that its audit request was compelled because it was analogous to the order at issue in *Central States*.[8] Yet, as discussed in Part II above, the circumstances of *Central States* were markedly different from those presented here. In *Central States*, the employers were required to contribute to the benefit plans based on the particular work employees performed. *See* 472 U.S. at 562 & n.2. The plaintiff benefit plans thus reasonably argued that they could not effectively conduct an audit based on employer-provided list of employees who had performed covered work—they needed to review a broader set of employee records to determine whether other, unidentified employees had performed covered work as well. *See id.* at 566–67. Here, in contrast, coverage is based not on function, but on the status of the employee: Is he or she a registered nurse or not? As described above, the Fund repeatedly fell short of providing a satisfactory explanation as to how payroll records for employees who are not registered nurses would enable the Fund's auditors to discover unfunded liabilities or identify new Plan participants, where their status as

---

[8] For instance, in its summary judgment briefing, the Fund relied on the purported similarity between its requested audit and the audit requested in *Central States* to support its right to review the payroll records of employees who are not registered nurses. *See* Plaintiff N.Y. State Nurses Ass'n Benefits Fund's Mem. of Law in Supp. of its Mot. for Summ. J. at 15, *NYSNA Benefits Fund*, No. 17-cv-1899 (S.D.N.Y. Feb. 15, 2019) (ECF No. 59) ("In both *Central States* and here, the review is intended to allow the auditors to conduct an independent verification of the employer's complete payroll records in order to determine whether the duties and status of each of the employer's employees has been accurately reported by the employer and to allow the auditors to independently determine the membership of the class entitled to participate in the plans, and thus verify that all required contributions are being made.").

registered nurses, not their functions, determined coverage. Only where an individual was a registered nurse occupying an excluded position, *see supra* note 2, and thus *not* subject to the CBA, was function a consideration. [9]

Even if the Fund's audit request were properly analogized to the request at issue in *Central States*, the authorized scope of the audit requested there was not before the Court. *See* 472 U.S. at 582 n.23 ("We note that in this case Central States has agreed to various limits on its audit so as not to exceed what would be reasonably appropriate for the service of the audit's legitimate purposes."). The Court's holding in *Central States* was a narrower one, as discussed above.

Barring an explicit commitment of the type missing here, district courts retain and need equitable discretion to impose reasonable limits on the audits that they order, even when those audits have not been demonstrated to violate fund trustees' fiduciary duties, and especially when the audits demanded do not conform to any unambiguous contractual obligation. I do not think that *Central States* eliminates such discretion—on the contrary, I understand *Central States* to state expressly that it does not.

Based on this legal and factual record, I would hold that the district court reasonably exercised its discretion in limiting the Fund's audit of the Hospital's payroll and wage records to those of its registered nurses.

---

[9] In a hearing conducted before the summary judgment motions were filed, the district court pressed the Fund's counsel to explain why reviewing the payroll records of all registered nurses at the Hospital would not be sufficient for the purposes of the audit. *See* J. App'x 549. Counsel for the Fund responded by pointing generally to the *Central States* decision and insisting that the Fund had the right to review the broader set of records based on that case. *See id.* at 549–50 ("The problem is that the fund does not have to under *Central States*, the auditor does not have to under the attestation standards rely on what the employer has already determined are the people that belong in the set of records that they are going to let them see."). The Fund did not explain at this juncture why reviewing payroll records for only registered nurses would not adequately serve the audit's purposes.

For all these reasons, I respectfully dissent.